**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DAVID ULLOA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 04 C 7761 |
| v. ) | |
| ) | Magistrate Judge Mason |
| JO ANNE BARNHART, ) | |
| Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Plaintiff, David Ulloa ("Ulloa" or "claimant"), has brought a motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Ulloa's claims for Disability Insurance Benefits ("DIB") under the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d). The Commissioner filed a cross-motion for summary judgment asking that we uphold the decision of the Administrative Law Judge ("ALJ"). We have jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Ulloa's motion for summary judgment is granted in part and denied in part. The Commissioner's motion for summary judgment is denied and the case is remanded for further proceedings consistent with this opinion.

**PROCEDURAL HISTORY**

Ulloa filed an application for disability insurance benefits on October 2, 2000. Ulloa's claim was denied initially on January 22, 2001, and upon reconsideration on May 25, 2001.

Ulloa then requested a hearing which was held on September 10, 2002, before ALJ John L. Mondi. Ulloa testified with the aid of an interpreter. Vocational expert ("VE") GleeAnn Kehr also testified. ALJ Mondi issued a written decision denying Ulloa's request for benefits on January 31, 2003. The Appeals Council denied Ulloa's request for review and ALJ Mondi's decision became the final decision of the Commissioner. *See Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Ulloa subsequently filed this action in the district court.

**FACTUAL BACKGROUND**

**Claimant's Testimony**

Ulloa was born on December 26, 1967. (R. 334). He was educated in Mexico and his highest level of education is the sixth grade. (*Id.*). He is able to read and write in Spanish, but not very well. (*Id.*). Ulloa came to the United Stated from Mexico in 1985. (R. 335). While Ulloa can understand some English, he is not able to read or write in English. (R. 334-35). Ulloa is married and has one child. (R. 334).

Ulloa alleged disability since February 17, 2000. (R. 335). Prior to the alleged onset of disability, Ulloa worked for an employer cutting steel. (R. 336-37). His responsibilities required him to lift bundles of steel weighing more than 20 pounds. (R. 337). After his injury, Ulloa returned to work at the same company on May 10, 2000. (R. 335). Upon his return, Ulloa's employer assigned him to a different job that did not require any lifting. (R. 336). He taught co-workers how to operate the machinery and did inventory work. (R. 349).

Ulloa testified that when he returned to work, he missed between four and seven days a month because he did not feel well. (R. 336). He testified that some days he would

skip the entire day of work, while other days he would have to leave work mid-day. (*Id.*). Ulloa testified that he experienced pain in his back and legs and dizziness from standing too long. (*Id.*). Ulloa explained that his job ended in August of 2000 when his employer wanted him to perform heavier work that he could not do. (R. 335-36).

Ulloa testified that at the time of the hearing, he was suffering from multiple symptoms due to his injury. (R. 338-43). He testified that he still experienced pain in his back and legs. (R. 338). He claimed that he would become dizzy after ten minutes of standing and that he could only tolerate twenty to thirty minutes of sitting. (R. 338). Ulloa also testified that bending or stooping causes him pain. (*Id.*). He takes Ultram and Robaxin to reduce pain and swelling. (R. 339-40). Ulloa claimed that the medications caused drowsiness and nausea. (R. 340). He further testified that he could only lift up to ten pounds. (R. 340).

Ulloa also claimed that his injury affected his ability to walk. (R. 338-39). He testified that he could walk for about ten minutes before he would have to stop to rest. (R. 338). Ulloa brought a cane to the hearing which he said he owned for the past year and a half. (*Id.*). He testified that he uses the cane when he leaves his house if he has to be on his feet for a long time. (R. 339). Ulloa said that he sometimes walks to the store, which is about five minutes from his house. (R. 342).

Ulloa explained that he can take care of himself but that he does not do much around the house. (*Id.*). He cooks or cleans once in a while, but he usually does not do the cooking or cleaning. (*Id.*). He can go to the store closest to his house alone but he usually goes with his wife. (*Id.*). Ulloa testified that during the day, he bathes, eats, reads the Bible, does exercises prescribed by his doctor for the pain and goes out to walk a little.

(R. 343). He also goes to church. (*Id.*).

Ulloa testified that his symptoms were getting worse over time. (R. 343). He claimed to be in constant pain and said he could not bend over. (*Id.*). He did not know whether he needed more therapy or whether the pain was because he was sitting around a lot. (*Id.*). He said that the last time he was in therapy was sometime in 2000. (*Id.*). Ulloa testified that he refused surgery because Dr. DePhillips told him that there was only a 50% chance for improvement and because people he spoke with during physical therapy said they were worse off after surgery. (R. 345).

**Medical Evidence**

After his work-related injury on February 17, 2000, Ulloa initially was treated by a chiropractor, Dr. Santiago. Ulloa saw Dr. Santiago frequently between February 21, 2000 and April 7, 2000. (R. 123, 134-176, 180-187). Treatment notes from this period reflect continuing complaints of pain. (*Id.*). A February 25, 2000 imaging report reveals degenerative disc disease in the lumbar and thoracic spine. (R. 132). Dr. Santiago discharged Ulloa on April 7, 2000 because Ulloa did not have a car to drive to the clinic. (R. 181). Dr. Santiago's discharge report indicates that Ulloa continued to suffer from low back pain. (*Id.*).

Dr. Segura, a neurologist, also treated Ulloa after his injury. (R. 123, 126). A February 22, 2000 note indicates that Ulloa had lumbar disc syndrome and vertebrogenic pain syndrome. (R. 125). While initial examinations found normal stance and gait, the records show that Ulloa suffered from reduced lumbosacral range of motion and experienced low back and thigh pain when performing straight leg raises. (R. 126). Ulloa complained that his pain was intensified by sitting. (*Id.*). On March 31, 2000, Dr. Segura

4

noted that neurodiagnostic studies were essentially normal. (R. 127). However, he also noted that a March 27, 2000 MRI revealed that Ulloa had a centrally herniated disc at L5-S1. (R. 127, 179). Ulloa continued to complain of low back and bilateral leg pain, which was aggravated by bending. (R. 127). Dr. Segura recommended that Ulloa continue with conservative management. (*Id.*). Dr. Segura released Ulloa to work as of April 6, 2000 subject to certain postural restrictions. (*Id.*). The restrictions provided that Ulloa should keep his trunk straight and that he should not bend forward, twist, or lift more than 20 pounds. (*Id.*). Dr. Segura noted that the permanency of the restrictions was unknown. (*Id.*).

After Dr. Segura discharged Ulloa, Dr. Shah began treating him in April 2000. (R. 227, 306). Ulloa complained of low and mid-back pain radiating to both legs. (*Id.*). Ulloa claimed the pain was a dull, nagging pain that was continuous and worsened with prolonged standing and ambulation. (R. 306). Dr. Shah diagnosed lumbosacral strain, a herniated disc and radiculopathy in the lower extremities.[1] (R. 307). Dr. Shah advised Ulloa to stay off work and to avoid heavy lifting and bending. (R. 308). He prescribed Robaxin and Naprosyn. (*Id.*). Dr. Shaw also prescribed physical therapy. (R. 224). Ulloa had physical therapy several times a week in April and May 2000. (R. 225-226, 228-257, 260-270).

Ulloa returned to Dr. Shah for follow-ups on his back pain through August of 2002. (R. 310-324). An April 26, 2002 progress note indicates that Ulloa continued to refuse surgery. (R. 322). The progress note states that Ulloa performed physical therapy

---

[1] A May 2000 electromyelogram (EMG) report showed no evidence of lumbar radiculopathy. (R. 257).

exercises at home, but he was afraid of surgery and wanted to apply for disability. (*Id.*).

Dr. Shah also referred Ulloa to Dr. DePhillips, a neurosurgeon. Ulloa had a neurosurgical consult on April 10, 2000. (R. 102). Dr. DePhillips noted that Ulloa's MRI revealed signs of internal disc disruption and disc protrusion, but that it did not show significant nerve root compression. (*Id.*). He indicated that the neurological examination did not reveal any motor weakness or atrophy. (*Id.*). Dr. DePhillips noted that Ulloa might be a candidate for diskectomy and fusion. (*Id.*). He also discussed epidural steroid injections with Ulloa, but Ulloa was reluctant to pursue that course of treatment at that time. (*Id.*). Dr. DePhillips suggested physical therapy. (*Id.*).

Dr. DePhillips saw Ulloa for a follow-up on May 8, 2000. (R. 105). At this point, Ulloa had begun physical therapy. (*Id.*). Dr. DePhillips recommended three additional weeks of physical therapy along with a lumbar epidural steroid injection.[2] (*Id.*). Dr. DePhillips released Ulloa to return to work with a ten-pound weight restriction and no excessive bending, twisting, or stooping, with no climbing as well as no prolonged sitting or standing. (*Id.*). On May 30, 2000, Ulloa continued to complain of low back pain radiating into his legs. (R. 107). He claimed physical therapy had not given him relief. (*Id.*). Dr. DePhillips explained to Ulloa that he had no evidence of nerve root compression. (*Id.*). He discussed Ulloa's options, including a diskectomy and spinal fusion. (*Id.*). Dr. DePhillips recommended that Ulloa remain on restricted work. (*Id.*).

Ulloa saw Dr. DePhillips again on June 27, 2000. (R. 106). Dr. DePhillips concluded that Ulloa had reached maximum medical improvement. (*Id.*). Ulloa did not

---

[2] Dr. DePhillips stated that he was recommending a second lumbar epidural steroid injection. However, there is no indication that a first injection was ever administered.

6

want to consider having surgery. (*Id.*). Therefore, Dr. DePhillips recommended that Ulloa continue with permanent restrictions at work. (*Id.*).

Dr. Robert England, a state agency reviewing physician, reviewed the medical evidence and completed a residual functional capacity ("RFC") assessment of Ulloa on December 1, 2000. (R. 285-92). Dr. England concluded that Ulloa could occasionally lift up to twenty pounds and could frequently lift up to ten pounds. (R. 286). Dr. England opined that Ulloa could stand, walk or sit for up to six hours out of an eight-hour work day. (*Id.*). Dr. England noted that Ulloa could never climb ladders, ropes or scaffolds, but that he could occasionally climb ramps or stairs. (R. 287). Dr. England also indicated that Ulloa could balance and kneel frequently, and could stoop, crouch or crawl occasionally. (*Id.*). On May 16, 2001, a second state agency physician named Dr. Francis Vincent reviewed the medical evidence and concurred with Dr. England's assessment. (R. 292). However, neither Dr. England nor Dr. Vincent reviewed statements from a treating or examining source regarding Ulloa's physical capacities. (R. 291).

On August 30, 2002, Dr. Shah completed an RFC assessment of Ulloa's ability to perform work-related activities. (R. 296-97). Dr. Shah found that Ulloa could lift less than ten pounds on an occasional and a frequent basis. (R. 296). Dr. Shah concluded that Ulloa could not sit or stand for more than two hours during an eight-hour day and that he could not do any excessive standing, walking or bending. (*Id.*). Dr. Shah opined that Ulloa could sit for thirty minutes and stand for ten minutes without changing position, that he would need to take a ten minute walk every thirty minutes, and that he would need to be able to lie down twice during an eight-hour work shift. (*Id.*). Dr. Shah also found that Ulloa could occasionally twist, stoop, crouch, and climb stairs but that he should never climb

7

ladders. (R. 297). Finally, Dr. Shah concluded that Ulloa's impairments or treatment would cause him to miss work more than four days per month. (*Id.*). Dr. Shah indicated that these limitations were supported by medical findings including a March 27, 2000 MRI which showed a dehydrated centrally herniated disc at L5-S1 and Ulloa's chronic pain. (R. 296).

**Vocational Expert's Testimony**

The administrative hearing included the testimony of VE GleeAnn Kehr. Ms. Kehr testified that Ulloa's previous work as a machine operator cutting steel was considered heavy and unskilled. (R. 350). The ALJ asked the VE to consider an individual having Ulloa's work experience, age, education, ability to read in Spanish, limited ability to write in Spanish, inability to read and write in English, and limited ability to understand English. (R. 351). The ALJ asked the VE a series of questions regarding this hypothetical individual's ability to perform jobs in the economy while subject to certain functional limitations.

The ALJ indicated that the hypothetical individual could do the lifting, standing and walking required of light work, subject to postural limitations against any climbing of ladders, ropes or scaffolds. (R. 351). The ALJ further provided that this individual could occasionally stoop, crouch, crawl, and climb ramps and stairs. (*Id.*). The ALJ asked whether this hypothetical individual could return to any past work. (*Id.*). The VE testified that this individual could not return to any past work. (*Id.*). However, the VE testified that such an individual could perform other jobs in the economy. (*Id.*). The VE stated that, within the Chicago metro area and surrounding counties, there are 4,000 machine operator jobs, 3,000 assembly jobs, and 3,000 packing jobs that this individual could perform. (R. 351-52). The VE indicated that these numbers would not change if the hypothetical

8

individual could not lift more than twenty pounds and could not do any excessive bending, twisting or stooping. (R. 352).

The VE then testified that if the individual could only lift up to ten pounds, there would be approximately 3,000 machine operator jobs, 2,000 assembly jobs, and 2,000 packing jobs that the individual could perform. (*Id.*). The VE explained that because sit/stand options are not readily available in manufacturing settings, the manufacturing jobs would be eliminated if the hypothetical individual required a sit/stand option. (*Id.*). The VE further stated that this individual would be limited to jobs in manufacturing settings because of his inability to speak English. (R. 352-53).

Next, the ALJ asked the VE what a hypothetical individual's vocational outlook would be if he had all of the limitations expressed in Ulloa's testimony. (R. 353). The VE testified that if someone needs to miss four to seven days of work per month, that alone would preclude any substantial gainful activity. (*Id.*). The VE further testified that Ulloa described the need for a sit/stand option and that his testimony was similar to the RFC assessment prepared by Dr. Shah. (*Id.*). Dr. Shah's RFC assessment and Ulloa's testimony indicate that he was not able to sit or stand for more than two hours in an eight-hour day. (*Id.*). The VE explained that an individual with such limitations would be considered less than sedentary. (*Id.*).

**LEGAL ANALYSIS**

**I.      Standard of Review**

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as

9

a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 28 L. Ed. 2d 842, 91 S. Ct. 1420 (1971)). We must consider the entire administrative record, but we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Id.* While the ALJ "must build an accurate and logical bridge from the evidence to [his] conclusion," he need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ must "sufficiently articulate [his] assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

## II.    Analysis Under the Social Security Act

Whether a claimant qualifies to receive disability insurance benefits depends on whether the claimant is "disabled" under the Social Security Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the

claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski*, 245 F.3d at 885-86. If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ followed this five-step analysis. The ALJ's findings with respect to steps one through four are not contested. At step one, the ALJ found that Ulloa had not engaged in substantial gainful activity since the alleged onset of the disability. (R. 22, 24). At step two, the ALJ found that Ulloa's degenerative bulging disc is a severe impairment. (*Id.*). At step three, the ALJ determined that Ulloa's impairment "does not meet or medically equal any impairment in Appendix 1, Subpart P, Regulations No. 4." (*Id.*). At step four, the ALJ determined that Ulloa could not perform any past relevant work because his work as a machine operator was exertionally heavy. (R. 23).

At step five, the ALJ found that although Ulloa's "limitations do not allow him to perform the full range of light work, there are a significant number of jobs in the national economy that he could perform." (R. 25). Therefore, the ALJ found that Ulloa is "not disabled" under the Act. (*Id.*).

Ulloa argues that the ALJ erred in his step five analysis because: (1) the ALJ's RFC determination is not supported by substantial evidence, and (2) the ALJ erred in rejecting Ulloa's credibility determination.

### III. The ALJ's RFC Determination Is Not Supported By Substantial Evidence.

The ALJ found that Ulloa has the RFC to lift up to twenty pounds occasionally, to carry up to ten pounds frequently, and to otherwise perform light work provided it does not involve climbing ladders, ropes or scaffolds, or more than occasional stooping, crouching, crawling, or climbing ramps and stairs. (R. 24). To be considered capable of performing light work, a claimant must have the ability to perform substantially all of the following activities: (1) lift no more than twenty pounds, (2) frequently lift objects weighing up to ten pounds, and (3) walk or stand for a good deal of time or sit while pushing or pulling arm or leg controls. 20 C.F.R. § 404.1567. Light work requires standing or walking, off and on, for a total of approximately six hours of an eight-hour workday. *See* SSR 83-10.

Ulloa argues that the ALJ's RFC determination is not supported by substantial evidence. We agree.

### A. The ALJ's Rejection of Dr. Shah's Opinion Was Based on Factual Error.

The ALJ explained that he did not give Dr. Shah's opinion controlling weight because he found that the opinion was inconsistent with the objective medical findings, Dr. Shah's treatment notes and the overall record. (R. 23). In particular, the ALJ noted that while Dr. Shah released Ulloa to return to a restricted range of light work in an earlier opinion, Dr. Shah's August 2002 RFC assessment set forth greater limitations that would preclude all work. (*Id.*). However, the earlier opinion referenced by the ALJ was Dr. DePhillips' opinion, not Dr. Shah's. (R. 108). Indeed, it was Dr. DePhillips who released Ulloa to a restricted range of light duty in May 2000. (*Id.*). Thus, the ALJ committed a factual error. Where the ALJ has erred in his analysis of the facts, remand is appropriate if there is reason to believe that a different result might ensue. *Prak v. Chater*, 892 F. Supp. 1081, 1087 (N.D. Ill. 1995) (citing *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)). Had the ALJ correctly

12

reviewed the evidence, he might have given Dr. Shah's opinion controlling weight. Accordingly, remand is appropriate.

### B. The ALJ Failed to Adequately Explain Why He Gave the Opinions of State Agency Physicians Controlling Weight.

No treating physician found Ulloa capable of performing light work. Indeed, Dr. Shah found that Ulloa could stand and/or sit for less than two hours during an eight-hour day. (R. 296). Dr. Shah also concluded that Ulloa's impairments or treatment would cause him to miss work more than four days per month. (R. 297). Dr. Segura released Ulloa to work but instructed him to keep his trunk straight and not bend forward, twist, or lift more than twenty pounds. (R. 127). Dr. DePhillips placed permanent work restrictions on Ulloa which provided that he could not lift more than ten pounds or sit or stand for a prolonged period of time.[3] (R. 105-06).

Nevertheless, the ALJ found Ulloa capable of performing a wide range of light work. The ALJ relied on the opinions of two state agency reviewing physicians in making his RFC determination. (R. 22). The state agency physicians concluded that Ulloa could lift up to twenty pounds occasionally and ten pounds frequently, and that he could sit, stand or walk for up to six hours in an eight-hour day. (R. 286). However, neither of these physicians examined Ulloa or reviewed statements from treating or examining sources regarding Ulloa's physical capacities. (R. 291).

Furthermore, the opinions of treating physicians who are familiar with the claimant's impairments, treatments, and responses are generally given great weight in disability

---

[3] While the Commissioner emphasizes the fact that Dr. DePhillips released Ulloa to work on a "light duty basis," the term "light duty" as used by Dr. DePhillips is inconsistent with "light work" as defined by the Social Security Administration. (R. 105).

determinations. *Clifford*, 227 F.3d at 870. If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent" with other substantial evidence, the ALJ must afford it "controlling weight." 20 C.F.R. § 404.1527(d)(2). Moreover, when the record contains opinions of both treating physicians and nonexamining physicians, courts have agreed that the opinions of the treating physicians must be given extra weight. *Grindle v. Sullivan*, 774 F. Supp. 1501, 1508 (N.D. Ill. 1991).

Here, the ALJ failed to adequately explain why he gave the opinions of the state agency physicians controlling weight when he should have given extra weight to the opinions of Ulloa's treating physicians. For instance, the ALJ indicated that he rejected Dr. Shah's opinion because it was inconsistent with the objective medical findings and the overall record. However, the ALJ failed to explain *how* Dr. Shah's opinion was inconsistent with the objective medical findings or the overall record. *See Clifford*, 227 F.3d at 870 (finding that the ALJ did not provide any explanation for his belief that the claimant's activities were inconsistent with the treating physician's opinion and his failure to do so constitutes error). The Court finds this lapse particularly troubling because Dr. Shah's opinion is supported by medically acceptable clinical and laboratory diagnostic techniques. Specifically, the March 27, 2000 MRI revealed a herniated disc at L5-S1. (R. 179). Additionally, as discussed more fully below, the ALJ provided absolutely no explanation for why he rejected the opinions of Dr. DePhillips and Dr. Segura.

The ALJ noted that the assessment by the state agency physicians was consistent with the medical evidence and the claimant's activities. (R. 22). However, once again, the ALJ failed to explain how the agency physicians' opinions were consistent with the medical

14

evidence or Ulloa's activities.  Indeed, it is unclear how the ALJ came to the conclusion that Ulloa's activities, which include occasional cooking and cleaning, going to church, walking five minutes to a nearby store and doing exercises prescribed to alleviate pain, are consistent with the ability to lift twenty pounds or sit, stand or walk for up to six hours in an eight-hour day.

Based on the foregoing, this Court finds that the ALJ's RFC determination is not supported by substantial evidence because he failed to sufficiently articulate his assessment of the evidence to enable us to trace the path of his reasoning.  Consequently, remand is warranted.  *Clifford*, 227 F.3d at 870 (recognizing that an ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability.").

### C. The ALJ Failed to Explain the Weight Given to the Opinions of Dr. DePhillips and Dr. Segura.

Under the applicable regulations, the ALJ is required to explain the weight given to the opinions of claimant's treating physicians.  20 C.F.R. § 404.1527(d)(2) (stating that, "we will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").  Dr. DePhillips concluded that Ulloa should be restricted from prolonged sitting or standing and from lifting more than ten pounds.  (R. 105-106).  Dr. Segura instructed him to keep his trunk straight and not bend forward, twist, or lift more than twenty pounds.  (R. 127).  These restrictions conflict with the wide range of light work the ALJ found Ulloa capable of performing.  However, the ALJ never explained why Dr. DePhillips' or Dr. Segura's opinions were not entitled to controlling weight. Because the ALJ failed to explain the weight given to the opinions of Dr. DePhillips and Dr. Segura, the ALJ did not build an accurate and logical bridge from the evidence to his

15

conclusion. Therefore, remand is appropriate. *See Clifford*, 227 F.3d at 870 (recognizing that failure to provide good reasons for discrediting a treating physician's opinion is grounds for remand).

On remand, the ALJ must reevaluate whether Dr. Shah's, Dr. DePhillips' and Dr. Segura's opinions are entitled to controlling weight. If the ALJ finds that any of these opinions is not entitled to controlling weight, the ALJ needs to explain the basis for that finding.

**IV.    The ALJ's Credibility Determination Is Not "Patently Wrong."**

Ulloa contends that the ALJ erred in rejecting his credibility. Ulloa argues that several factors in the record support his credibility, including: the opinions of his treating physicians, an MRI showing a herniated disc, his complaints of ongoing pain and dizziness, prescribed medication to alleviate the pain, as well as his pursuit of significant treatment over time.

To succeed on this ground, Ulloa must overcome a highly deferential standard that we accord credibility determinations. *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (holding that the credibility determinations of hearing officers are afforded special deference). We will reverse an ALJ's credibility determination only if the claimant can show that it was "patently wrong." *Id.*

Here, the ALJ based his credibility determination on a number of facts and observations. The ALJ found that Ulloa's testimony regarding his pain and functional limitations was not credible as to a condition that would preclude all competitive work in light of the objective medical findings. (R. 23). The ALJ noted that the objective findings showed that Ulloa's disc was not significantly herniated and that the findings on

examination revealed no motor weakness or atrophy. (*Id.*). The ALJ also noted that Ulloa's pursuit of medical treatment was not consistent with disabling pain given the fact that he was reluctant to undergo surgery or receive epidural steroid injections. (*Id.*). The ALJ further stated that the medical records reflect Ulloa's desire to collect disability benefits. (*Id.*).

The ALJ also observed that Ulloa was able to sit for forty-five minutes at the hearing before needing to stand, and he was then able to resume sitting after only two minutes of standing. (R. 23). The ALJ found these actions to be inconsistent with Ulloa's testimony that he could only sit for twenty to thirty minutes. (*Id.*). While some courts have condemned the "sit and squirm" test, the Seventh Circuit has repeatedly endorsed the role of observation in credibility determinations. *Powers*, 207 F.3d at 436. The ALJ's observation as to whether the claimant is suffering from pain consistent with his testimony is one of the factors that may contribute to a credibility determination. *Id.*

Based on the foregoing, this Court finds that the facts and observations noted by the ALJ provide support for the ALJ's credibility determination. Thus, even if portions of the record support Ulloa's credibility, we cannot conclude that the ALJ's credibility determination was patently wrong. Accordingly, we will not remand on this basis. *Powers*, 207 F.3d at 435; *see also, Edwards v. Sullivan*, 985 F.2d 334, 338 (7th Cir. 1993) (recognizing that a reviewing court should not reconsider credibility determinations made by the ALJ as long as they find some support in the record).

**CONCLUSION**

For the reasons set forth above, Ulloa's motion for summary judgment is granted in part and denied in part. The Commissioner's motion for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this opinion. It is so ordered.

ENTER:

_____

**MICHAEL T. MASON**
**United Stated Magistrate Judge**

**Dated: March 13, 2006**